IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Devicor Medical Products, Inc., | : | |
| | : | Case No. 1:11CV645 |
| Plaintiff, | : | |
| | : | Chief  Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING PLAINTIFF'S |
| Keith Reed, | : | MOTION FOR A PRELIMINARY |
| | : | INJUNCTION and DENYING AS |
| Defendant. | : | MOOT PLAINTIFF'S MOTION FOR |
| | : | LEAVE TO FILE SUPPLEMENTAL |
| | : | MEMORANDUM |
| | : | |

This matter comes before the Court on Plaintiff's Motion for Temporary Restraining

Order and Preliminary Injunction.  (Doc. 3.)  In this lawsuit, Plaintiff Devicor Medical Products,

Inc. ("Devicor"), sues its former employee, Defendant Keith Reed, for breach of contract,

misappropriation of trade secrets in violation of Ohio's Uniform Trade Secrets Act, breach of

common law duties of non-disclosure, and unfair competition.  Devicor's claims relate to Reed's

resignation from Devicor and acceptance of a position with one of Devicor's alleged

competitors, Hologic, Inc.  Devicor seeks to enforce the Employee Covenants Agreement that

Reed signed while employed by Devicor and that contains a non-competition provision, no-

disclosure provision, and non-solicitation provision.  Devicor requests an order enjoining Reed

from: (a) engaging in any sales or other activity on behalf of Hologic, including specifically its

Sentinelle or Interventional Breast Solutions operating divisions, for a period of one year from

the entry of the Court's injunction;[1] (b) directly or indirectly disclosing or otherwise using

---

[1] Devicor also suggests a narrower injunction that would enjoin Reed from engaging in
any sales or other activity on behalf of Hologic, including specifically its Sentinelle or

1

Devicor's confidential, proprietary or trade secret information for the benefit of himself or any

third party, including Hologic, and directing Reed to return to Devicor all such confidential,

proprietary or trade secret information in documentary or other tangible form that he possesses;

and (c) directing Reed, for a period of one year from the entry of the requested order not to

directly or indirectly engage in any business similar to that conducted by Devicor, in any

capacity, and not to divert, take away or attempt to divert or take away any customer, potential

customer, or business of Devicor for the benefit of himself or any third party, including Hologic.

(Doc. 27 at 19, Page ID # 705.)

     During an initial hearing, the Court denied Plaintiff's request for a temporary restraining

order and scheduled an evidentiary hearing as to Plaintiff's request for a preliminary injunction.

Following the preliminary injunction hearing, the Court accepted post-hearing briefs from the

parties.  (Docs. 26, 27.)   For the reasons set forth below, the Court **DENIES** Plaintiff's motion.

## I.    BACKGROUND

###     A.    Corporate Entities Involved in the Dispute

     Before delving into the background of Reed's employment with Devicor and his

subsequent move to Hologic, a discussion of the corporate entities involved in this dispute (listed

in the table below and discussed in greater detail in this Section) and the general relationship

between those entities is necessary.

     The following table shows the Defendant Reed's former employer, Plaintiff Devicor,

along with Reed's current employer, non-party Hologic, and the relevant operating divisions of

---

Interventional Breast Solutions operating divisions, *within his former Devicor territory* for a
period of one year from the entry of the Court's injunction.  (Doc. 27 at 20, Page ID # 706.)

each company.

| Corporation: | DEVICOR | HOLOGIC | |
|---|---|---|---|
| **Operating Division:** | Mammotome | Interventional Breast Solutions (IBS) | Sentinelle |
| **Product Line(s) Sold by the Operating Division:** | Mammotome breast *biopsy* equipment | Suros breast *biopsy* equipment | Breast and prostate *imaging* equipment, including MRI breast and prostate coils and related targeting software |

Though Devicor is a company with at least two operating divisions, the only division at issue in this lawsuit is Mammotome. Accordingly, the Court refers to Mammotome and Devicor interchangeably throughout this Order.

In contrast, there are two operating divisions of Hologic – IBS and Sentinelle – who, while not parties to this lawsuit, are nonetheless involved in the instant dispute. Any references to Hologic in this order refer only to Hologic as a parent company and not to either of the two divisions, which the Court will identify separately when necessary.

### 1. Mammotome, IBS, and the Breast Biopsy Business

All of the corporate entities at issue in this case participate either directly or indirectly in the breast biopsy product market. The typical breast biopsy procedure, employed to extract tissue from the breast after an abnormality or potential abnormality has been detected, involves at least three steps, each of which requires different equipment. For Step 1, an imaging device, such as a stereotactic (x-ray), ultrasound, or MRI device, is used to enable the clinician to locate the lesion or area of abnormality; for Step 2, the clinician uses some form of targeting equipment to isolate the specific location of the lesion; and for Step 3, the clinician uses biopsy equipment

to extract tissue from the site of the abnormality for further testing. (Prelim. Inj. Hr'g Tr.[2] 17–18, Page ID # 537–38.)

Devicor's Mammotome division and Hologic's IBS division ("IBS") both sell competing lines of products that fall into the third step – equipment used to extract tissue during a breast biopsy. (*Id.*) The only other known competitor in the field of breast biopsy equipment is the company C.R. Bard ("Bard"), which sells a product line known as SenoRx that is similar to Devicor's Mammotome line and IBS' Suros line. (*Id.*; Def. Ex.[3] 1 ¶¶ 8–9.) The breast biopsy equipment sold by Mammotome, IBS, and Bard include: (a) disposable needles and probes; (b) tissue markers; and (c) a control module that creates the vacuum effect necessary to extract the tissue. (*See* Def. Ex. 3 at 2–3; Def. Ex. 18; Tr. 114, Page ID # 634.) Different types of needles, probes, and tissue markers are used in connection with each imaging mechanism. (*See* Def. Ex. 3 at 2; Tr. 72–73, Page ID # 592–93.) In other words, if a clinician is using an MRI device to image the lesion, that clinician would use needles, probes, and markers specifically designed for use with MRI equipment. Mammotome makes breast biopsy equipment that can be used in connection with all three of the imaging methods listed above. (*See id.*)

The entities that purchase the breast biopsy products sold by Mammotome, IBS, and Bard typically are hospitals, imaging centers, or private surgical practices. (Def. Ex. 1 ¶ 10.) The identities of these customers are not confidential. (*Id.*; Tr. 31, Page ID # 551.) It is not uncommon for a customer to purchase breast biopsy equipment for use with one imaging

---

[2] The Preliminary Injunction Hearing Transcript was filed electronically under this case number at Doc. 25. In all subsequent citations, the Court refers to the transcript simply as "Tr."

[3] All references to "Def. Ex." and "Pl. Ex." refer to exhibits submitted during the preliminary injunction hearing.

mechanism from one company, and to purchase breast biopsy equipment for use with other imaging mechanism from another company.  For example, a hospital might utilize Mammotome breast biopsy equipment for its ultrasound-guided biopsies, but utilize IBS breast biopsy equipment for its stereotactic-guided biopsies and MRI-guided biopsies.  (Nick Nocito Dep.[4] 41, Page ID # 477.)

### 2.        Sentinelle and the MRI Imaging Business

Hologic's Sentinelle division sells equipment – breast and prostate "coils" –  and software that are used in conjunction with MRI machines when a patient is undergoing a breast or prostate MRI.  If utilized in the context of a breast biopsy, Sentinelle's equipment would fall under Steps 1 and 2, described above.  Sentinelle does not sell the actual MRI machines, only the companion targeting equipment.  In the context of MRI imaging, the term "coil" refers to equipment that surrounds and targets a specific area of the body, whether it be a head, neck, knee, hip, or in the case of Sentinelle's products, a breast or prostate.[5]  The coil is designed to isolate the area being imaged and to allow the clinician conducting the MRI to achieve the clearest image possible.  (Tr. 17–18, Page ID # 537–38.)  Sentinelle also sells Aegis brand computer targeting software that the clinician uses to pinpoint for biopsy purposes the particular lesion or tissue abnormality being examined.  (*Id*. at 18, Page ID # 538; Def. Ex. 18.)

Unlike breast biopsy equipment, Devicor does not sell any imaging-related products

---

[4] Nick Nocito's deposition transcript was filed electronically under this case number at Doc. 21.

[5] For example, a breast coil shown in one of Sentinelle's brochures is a product comprised of an arched imaging table with two holes, on which a patient would lie face down with his or her breasts inserted through the holes.  (Tr. 16–17, Page ID # 536–37; Pl. Ex. 2.)  The table has strategically-placed coils that direct the magnetic energy from the MRI device to the area being imaged.  (*Id*. at 19, Page ID # 539.)

equivalent to those sold by Sentinelle. (Tr. 19, 25, Page ID # 539, 545.) Sentinelle's competitors in the MRI breast coil and targeting software business are Invivo and General Electric ("GE"). (*See* Tr. 26, 78, Pg. ID # 546, 598; Def. Ex. 18.) According to Reed, the main features of Sentinelle's products that distinguish them from competing products include the quality of the images Sentinelle's equipment helps to produce, improved patient comfort with regard to the coil, and the ability to image larger patient segments. (Tr. 78–79, Page ID # 558–59.)

### 3.  The Relationship Between Mammotome's Breast Biopsy Equipment and Sentinelle's MRI Imaging Equipment

There are limited circumstances under which Mammotome products would be used in connection with Sentinelle products. As indicated above, breast biopsies can be done in connection with at least three different methods of imaging the breast: ultrasound, stereotactic (x-ray), and MRI. (*See* Def. Ex. 5; Tr. at 17–18, Page ID # 537–38.) Ultrasound-guided biopsies and stereotactic-guided biopsies are more common than MRI-guided biopsies. (*See* Tr. 28, 73–75, Page ID # 548, 593–95; Nocito Dep. 40–41, Page ID # 476–77.) In line with that trend, the equipment needed for MRI-guided breast biopsies makes up only about 20% of Mammotome's business. (*See* Nocito Dep. 40–41, Page ID # 476–77; Def. Ex. 5.) As the MRI breast coil and targeting software sold by Sentinelle have no use in or relation to either ultrasound-guided biopsies or stereotactic-guided biopsies (Tr. 76, Page ID # 596), the percentage of Mammotome's business in which its products are used in conjunction with Sentinelle's products would fall somewhere within that 20% slice, with the other portion of that slice representing the percentage of Mammotome's business in which its MRI-guided breast biopsy products are used in conjunction with the products of Sentinelle's competitors, Invivo and

6

GE. (*See id.* at 19, 25–26, Page ID # 539, 545–46.) In simpler terms, less than 20% of Mammotome's business involves procedures in which Mammotome's products are used with Sentinelle's products.

Just as only a sliver of Mammotome's business overlaps with Sentinelle's business, the converse is also true. Specifically, the great majority of procedures for which the MRI breast coil and targeting software are used do not involve a biopsy procedure. (*Id.* at 77–78, Page ID # 597–98 (explaining that no biopsy is performed in 90-95% of the procedures in which a Sentinelle MRI breast coil is used); *see also* Def. Ex. 5.) In fact, there are numerous facilities that may only perform imaging and then refer the patient elsewhere if a biopsy is recommended. (Tr. 125–26, Page ID # 645–46.)

### 4. Hologic's Acquisition of Sentinelle and the Business Relationship Between Sentinelle, IBS, and Mammotome

As indicated above, Devicor owns Mammotome, whereas Hologic owns both Sentinelle and IBS. Sentinelle was acquired only recently by Hologic in July 2010. (Tr. 20, Page ID # 540.) Because their products are compatible, Sentinelle and Mammotome representatives have worked together in the past. (*Id.*) Devicor contends that since Hologic acquired Sentinelle, any joint efforts between Sentinelle and Mammotome have ceased. For example, Devicor points to the fact that in April 2010, prior to Hologic's acquisition of Sentinelle, Mammotome and Sentinelle representatives participated in a joint webinar so that the sales representatives could learn how each other's products worked. (*Id.*) Since Hologic purchased Sentinelle, Devicor and Sentinelle have not held any joint seminars or meetings. (*Id.* at 20–21, Page ID # 540–41.) Perry Norris, a Senior Marketing Manager at Devicor, testified that he no longer encourages his sales representatives to work with Sentinelle representatives because he is worried those

7

individuals will share information with representatives of IBS, the Hologic-owned competitor of Mammotome. (*Id.* at 36, Page ID # 556.)

Norris additionally testified that be believed there have been changes in Sentinelle's marketing strategy. For example, Sentinelle, Mammotome, and Mammotome competitors generally all participate in the Radiological Society of North America ("RSNA") trade show each year. (*Id.* at 21, Page ID # 541.) During the trade shows that occurred before Hologic acquired Sentinelle, Sentinelle on occasion displayed the breast biopsy products of Mammotome, IBS, and Bard with its breast coil products. (*Id.* at 21–22, Page ID # 541–42.) During the 2011 RSNA trade show, the only breast biopsy products Sentinelle chose to display with its breast coils were IBS' Suros products. (*Id.*)

Norris testified that he felt Hologic's acquisition of Sentinelle was "a punch in the stomach." (*Id.* at 23, Page ID # 543.) He learned of the acquisition through a press release, which included the comment that "Hologic President and CEO Rob Cascella said the acquisition advances the company's strategy and portfolio in women's healthcare, especially in breast cancer detection and intervention, and broadens Hologic's presence in women's health by offering additional products through existing sales channels."[6] (*Id.* at 22–23, Page ID # 542–43.) Perry believed Devicor had developed a mutually advantageous sales relationship with Sentinelle and worried that relationship would be destroyed now that Sentinelle had been purchased by the parent company of IBS, one of Devicor's main competitors. (*Id.* at 23–24,

---

[6] The Court considers this passage only to the extent that it provides insight into Perry's reaction to the acquisition. To the extent that Plaintiff relies on the excerpt as proof of Hologic's sales strategy, the statement is offered for the truth of the matter asserted, and therefore is inadmissible hearsay. Even if the Court were to consider the statement for that purpose, there is no evidence that Hologic took any steps to merge Sentinelle sales channels with pre-existing Hologic sales channels. (*See* Tr. 31–32, 37, Page ID # 551–52, 557.)

Page ID # 543–44.)

Devicor contends that Hologic intends to market and sell its Sentinelle imaging and IBS biopsy products as a bundled package, referred to as the "total solution." (*See id*. at 104, 129–31, 136–37, Page ID # 624, 649–51, 656–57.) The "total solution" language comes from two marketing brochures discussed during the preliminary injunction hearing. (*See* Def. Ex. 16; Pl. Ex. 13.) The first brochure was created in 2009, before Hologic acquired Sentinelle, and describes use of IBS' products in MRI-, stereotactic-, and ultrasound-guided biopsies. (*See* Def. Ex. 16.) The second brochure, taken from Hologic's website in the fall of 2011, after Hologic purchased Sentinelle, retains the "total solution" language, and in the section describing MRI-guided biopsies, it discusses the relationship of Hologic and Sentinelle as follows:

> The teaming of Hologic and Sentinelle now allows physicians an improved solution in early breast cancer detection and accurate intervention. The innovative design of the Sentinelle breast coil is an example of our continued drive to provide best in class products to meet the needs of our customers.

(Pl. Ex. 13; Doc. 5-1 at 4, Page ID # 112; Tr. 129–31, Page ID # 649–51.)

Defendant objects to Devicor's suggestion that Sentinelle and IBS are now expected to conduct a joint marketing initiative. First, Defendant emphasizes that Sentinelle and IBS are separate and distinct businesses that continue to operate separately from each other, though they may occasionally participate in joint marketing initiatives. (Def. Ex. 1 ¶ 14; Def. Ex. 2 ¶ 7.) IBS and Sentinelle have separate headquarters – Sentinelle is based in Toronto, Canada, and IBS is based in Indianapolis, Indiana – and separate management structures. (Def. Ex. 1 ¶ 14.) IBS has its own sales staff and sales representative assigned to customers in Florida, the region in which Reed works. (*Id*.) As discussed in great detail above, the two divisions sell different products. (*See* Def. Ex. 1 ¶¶ 8, 15; Def. Ex. 18.) Reed maintains that Sentinelle is not responsible for

9

marketing IBS products and rejects any knowledge of an overarching marketing strategy to offer

Sentinelle and IBS products as a bundled package.  When asked about the "total solution"

marketing materials, Reed testified that he had never seen the materials prior to their production

in this lawsuit and that he has no knowledge of any "total solution" program.  (Tr. 104, 136,

Page ID # 624, 656.)  He believed the materials were from IBS' marketing team.  (*Id.*)

Second, contrary to the alleged exclusive coupling of IBS and Sentinelle, Reed points to

evidence indicating that even after Sentinelle was purchased by Hologic, Sentinelle continues to

expect its representatives to work with Mammotome on joint-marketing initiatives similar to

those undertaken by IBS and Sentinelle.  Specifically, Sentinelle's Regional Sales Director in

charge of the Southeast Region, Gregory Carpenter, attested that:

> Since Hologic acquired Sentinelle in August, 2010, I have been made aware of
> marketing materials and brochures referencing the teaming of Hologic and
> Sentinelle.  I also have attended meetings involving discussions about jointly
> market[sic] products sold by Hologic's separate divisions.  Sentinelle's sales reps
> operate independently.  *The interaction between the Sentinelle reps with the IBS
> reps is similar to the interaction we expect our Sentinelle reps to have with other
> manufacturers of biopsy products.  Sentinelle still encourages its sales team to
> develop relationships with biopsy reps from IBS, Devicor, and C.R. Bard.*

(Def. Ex. 2 ¶ 7 (emphasis added).)  Similarly, because Mammotome's equipment also is

compatible with the equipment of Sentinelle's competitors, Mammotome has encouraged its

sales representatives to work with representatives of those entities.  (*See* Tr. 33, Page ID # 553.)

In other words, the evidence indicate that all of the entities selling products used in MRI-guided

breast biopsy procedures work with each other from time to time.


**B.      Reed's Employment with Devicor and Hologic**

**1.      Employment History**

10

Reed became employed by Ethicon Endo-Surgery ("Ethicon"), Devicor's predecessor, in June 2005 after his honorable discharge from the United States Navy.  (Def. Ex. 1 ¶ 2; Tr. 39, Page ID # 559.)  During his employment with Ethicon, Reed's primary responsibility was selling the Mammotome breast biopsy system in the Central Florida sales territory.  (*Id*.)  Reed became a Devicor employee in July 2010 when Devicor purchased the breast health business of Ethicon.  (Def. Ex. 1 ¶ 4; Tr. 40, Page ID # 560.)  As a Devicor employee, he continued to sell Mammotome products in the Central Florida sales region.  (Def. Ex. 1 ¶ 8; Tr. 40, Page ID # 560.)

In June 2010, shortly before the Devicor acquisition was finalized, Reed was required to and did sign an Employee Covenants Agreement, which included, among other items, a non-disclosure clause restricting the use of confidential information, a non-competition clause restricting certain employment for twelve months after the end of his employment with Devicor, and a non-solicitation of customers clause.  (*See* Pl. Ex. 5; Tr. 40, Page ID # 560.)  Reed signed a second Employee Covenants Agreement in July 2010 (Tr. 41, Page ID # 561), after Devicor amended the following non-competition clause to including an exception (italicized portion, hereinafter referred to as the "Non-Compete Exception") for employment with a separate division of a competitive organization:

> I acknowledge and agree that my services to the Company are and will be unique in nature, and that the Company would be irreparably harmed if I were to provide similar services to a person or entity competing with the Company within the restricted time periods and geographical areas set forth herein.  Therefore, I agree that during the period of my employment with the Company and for the 12 month period following termination of my employment with the Company for any reason, I will not (i) permit my name to be used by or participate in any business or enterprise (including, without limitation, any division, group, or franchise of a larger organization) that engages in the same business as the Company in an area of the United States in which the Company operates, performs services, or

11

markets its services or products (a "Conflicting Organization"); or (ii) provide services which are materially similar to the services provided by the Company to,[sic] solicit or permit my name to be used by any Conflicting Organization to solicit orders from, any customer with whom I had material contacts in connection with the Company's business during the 12 months immediately preceding the termination of my employment with the Company. *Notwithstanding the foregoing, with respect to any Conflicting Organization whose business is diversified, I understand that I will be permitted to render services to any division, department or demonstrably separate segment of such Conflicting Organization that does not engage directly or indirectly in the same business as the Company; provided, however, that prior to my accepting such employment I will submit to the Company a separate written assurance, satisfactory to the Company and signed by both me and the Conflicting Organization for whom I wish to work, reaffirming that for the 12 month period following my termination of employment from the Company I will not render (nor be asked to render) services directly or indirectly to such Conflicting Organization that would otherwise result in my breach of this Agreement*. . . .

(Pl. Ex. 6 at 2 ¶ 4; *see also* Reed Dep.[7] 14–15, Page ID # 236–37.)  Reed signed another

Employee Covenants Agreement in February 2011 containing the same carve-out exception to

the non-competition clause.  (Pl. Ex. 8.)

The 2011 Employee Covenants Agreement was signed in connection with a retention

bonus given to Reed that year.  In February 2011, Reed received a letter ("Retention Bonus

Letter") from Mammotome's Vice President of Global Sales describing the retention bonus that

Reed was to receive as an "added incentive for 2011."  (Pl. Ex. 7; Tr. 41–42, Page ID # 561–62.)

Reed's consent to the 2011 Employee Covenants Agreement was one condition to his receipt of

the retention bonus.  Other conditions imposed in order for Reed to "begin and continue to

receive the benefits" outlined in the Retention Bonus Letter included that Reed: (a) remain

employed with Devicor in his then-current position; (b) remain in good standing; and (c) keep

confidential all information regarding the retention bonus.  (Pl. Ex. 7 at 1.)  The bonus was to be

---

[7] Reed's deposition transcript was filed electronically under this case number at Doc. 19.

paid in ten monthly payments of $2000 each between the months of February and November 2011.  (*Id*.)  In addition to setting forth the terms of the bonus, the Retention Bonus Letter clarified that the letter itself did "not imply an employment contract" and that Reed's relationship with Devicor would "continue to be at-will," meaning that Reed or Devicor could "terminate [Reed's] employment at any time, with or without cause or notice."  (*Id*. at 2.)  Reed received retention bonus payments from February to August 2011.  (Tr. 42, Page ID # 562.)  The payments ceased after Reed's resignation, which formally occurred on August 25, 2011.  (*Id*.; Def. Ex. 1 ¶ 12.)[8]

The circumstances of Reed's resignation are not in dispute.  Reed was not recruited by Hologic.  (Def. Ex. 1 ¶ 12.)  Rather, while still working for Devicor, Reed learned of a sales position opening in Hologic's Sentinelle division.  (*Id*.)  He applied for and was offered the position.  (*Id*.)  On August 22, 2011, he notified his direct supervisor, Nick Nocito, by telephone and in writing of his intention to take the position with Sentinelle.  (*Id*. at ¶¶ 12, 17; Def. Ex. 10; Tr. 95, Page ID # 615.)  Nocito requested that Reed stay on with Devicor until September 9 in order to assist with the orderly transition of his Devicor accounts, and Reed agreed to this request.  (Def. Ex. 1 ¶ 17.)  However, on August 25, 2011, Reed received a letter from Devicor indicating that his resignation was effective immediately.  (*Id*.; Tr. 55, Page ID # 575.)  Upon receiving that notice, Reed sent emails to at least some of his Devicor clients to let them know he

---

[8] During the preliminary injunction hearing and in the post-hearing briefing, Devicor alleged that Reed breached the terms of his retention bonus by leaving prior to 2011.  The Court disagrees and believes this issue is a red herring.  The Bonus Retention Letter does not state the receipt of the bonus payments are continent on Reed remaining employed by Devicor through the entirety of 2011.  Nor does it include any requirement that Reed return any bonus payments in the event he terminates his employment prior to the close of 2011.  Rather, the fact that the bonus is structured in monthly $2,000 payments suggests an intent to reward Reed for each month of continued employment.

had resigned and that Nocito would be taking over their accounts. (Tr. 54–55, Page ID # 574–75.)

After resigning his employment with Devicor, Reed accepted a position with Sentinelle and began working for Sentinelle on August 29, 2011. (*See* Def. Ex. 11 at 2.) Reed did not seek permission from Devicor prior to taking the position at Sentinelle. (Tr. 54, Page ID # 574.) Nor did he provide any written assurance, other than his existing Employee Covenants Agreement, that he would not compete with Devicor in his new role. (*Id.*)

### 2. Nature of Reed's Role at Devicor

Relationship between Sales Representative and Client

When working with Mammotome customers, Mammotome sales representatives interact most closely with the customer's interventional radiologist. (Tr. 26, Page ID # 546.) Reed concede's that the relationship between the sales representative and the radiologist is important to Mammotome's business. (*Id.* at 44, Page ID # 564.) The Mammotome representative's role includes educating the radiologist on the use of Mammotome equipment. (*Id.* at 26, 45, Page ID # 546, 565.) For example, Mammotome holds continuing medical education courses and workshops for its customers, trains radiologists and surgeons on the proper usage of its products, and occasionally assists with or oversees a clients' use of the products during a biopsy procedure. (*Id.* at 27, Page ID # 547.) Reed testified that he typically only assisted clients with using Mammotome products for limited periods of time until the physicians became comfortable with the equipment. (*Id.* at 45, Page ID # 565.)

Access to Confidential Information

Devicor's Employee Covenants Agreement defines "Confidential Information" to

include,

> information (i) disclosed to, obtained or known by me as a result of my
> employment with the Company, (ii) not generally known to others outside the
> Company, and (iii) which relates to, among other things, (a) customers and clients
> and customer or client lists, (b) customer information, including customer needs,
> contacts, particular projects, and pricing, (c) accounting and business methods, (d)
> services and products and the marketing of such services or products, (e) fees,
> costs, and pricing structures, (f) the Company's sales, finances, operations,
> processes, methods, techniques, devices, software programs, projections,
> strategies and plans, personnel information, industry contacts made during my
> employment; (g) technology and trade secrets, and (h) all similar or related
> information in whatever form.

(Pl. Ex. 8 at 1.)  Norris similarly testified that Devicor's sales representatives, including Reed,

have access to information that Devicor considers confidential, such as the locations of

Devicor's customers, as well as the devices, targeting techniques, and size of needles used by

those customers.  (Tr. at 28–29, Page ID # 548–49.)  That testimony, however, is at least

somewhat contradicted by Norris' subsequent admission that the identity of Devicor's customers

is not confidential and by his description of the MRI imaging and breast biopsy fields as

specialized, narrow, markets, in which all of the participants are known to each other.[9]  (*See id*.

at 24, 31, Page ID # 544, 551.)  Reed also testified that contrary to what is stated in the

Employee Covenants Agreement, client lists are not confidential.  (*Id*. at 43–44, Page ID #

563–64.)  He did agree generally that the other types of information described were confidential.

(*Id*. at 44, Page ID # 564.)

Reed maintains that he did not take any Devicor documents or property with him when

he left Devicor, and does not have any confidential documents or property belonging to Devicor

---

[9] Specifically, Norris stated that the MRI imaging and breast biopsy fields are
specialized, narrow markets, in which "everyone knows everyone," including "the radiologists
that perform these procedures."  (Tr. 24, Page ID # 544.)

in his possession.  (Def. Ex. 1 ¶ 23; Tr. 92, Page ID # 612.)  He also denies revealing any of

Devicor's confidential information to anyone at Hologic (Tr. 91–92, Page ID # 611–12), and

Devicor points to no evidence to the contrary (*see id*. at 30–31, Page ID # 550–51).

### 3.     Nature of Reed's Role at Hologic

In his position with Sentinelle, Reed is responsible for selling Sentinelle's MRI breast

and prostate coils and the Aegis targeting software offered by Sentinelle.  (Def. Ex. 2 ¶ 5.)  His

sales territory is larger than the territory he dealt with while he was at Devicor; it includes most

of Florida and a small part of southern Georgia.  (Tr. 56, Page ID # 576.)  In contrast to the

nature of his customer relationships at Devicor, Reed's current relationships with his customers

do not require as much "hand holding."  (*Id*. at 44–45; Page ID # 564–65.)

Some of the Sentinelle customers Reed currently services also are Devicor customers,

and Reed now occasionally interacts with some of the same physicians with whom he worked as

a Devicor representative.  (*Id*. at 46–48, Page ID # 566–58.)  For example, since becoming a

Sentinelle sales representative, Reed has had to visit Florida Hospital Waterman, a hospital that

was one of Reed's customers when he worked at Devicor and that had been a customer of

Sentinelle prior to Reed joining the company.  (*Id*. at 46–47, Page ID # 566–67.)  Reed has not

sold the hospital any new Sentinelle products.  Rather, he visited the hospital to address an issue

the hospital was having with Sentinelle equipment that it previously had purchased.  (*Id*.)  That

hospital continues to use Mammotome biopsy products in conjunction with Sentinelle imaging

coils.  (*Id*. at 47, Page ID # 567.)

Other current or potential clients that Sentinelle and Devicor have in common with whom

Reed has worked include Flagler Imaging and Vero Radiology.  (*Id*. at 47–48, Page ID #

16

567–68.)  Reed has called on Flagler Imaging to try to sell Sentinelle products, but he maintains he has not discussed IBS' biopsy products with them.  (*Id*.)  During his visit to Flagler Imaging, one of the physicians asked him how Mammotome products would work with Sentinelle products, and Reed responded that the products are "[t]otally compatible."  (*Id*. at 82, Page ID # 602.)  Devicor did point to evidence that Mammotome had lost at least some portion of Vero Radiology's business, though the extent of the loss and Reed's actual role in that loss is unclear.  After learning that Reed had visited Vero Radiology on behalf of Sentinelle in late September 2011, Reed's former supervisor at Devicor, Nocito, contacted Vero Radiology's Patient Service Coordinator, Maureen Leu to check on their relationship with Devicor.  (Nocito Decl.[10] at 1, 2, Ex. A; Tr. 48–49, Page ID # 568–69.)  In her email response, Leu stated:

> Since Keith has moved on from [Mammotome] the radiologists have decided to merge our atec unit from Hologics[sic] into our stereo room.  We had already been utilizing the equipment in our US department so they preferred to use it in stereo also giving them consistence[sic] between departments as well as they are using this at Sebastian Hospital also.  If something should change I will definitely be in touch.  Please feel free to contact me also if anything changes with the mammotome unit that you think would interest the radiologist.

(Nocito Decl. Ex. A.)  When asked what Leu meant in that response, Reed testified that he understood the email to mean Vero Radiology had decided to switch from Mammotome to Hologic products to be used in conjunction with one type of imaging mechanism.  (Tr. 50, Page ID # 570.)  The ATEC unit referenced in the email is an IBS biopsy device.  (*Id*. at 110, Page ID # 630.)  Vero Radiology had already been using that unit in conjunction with their ultrasound-guided biopsies.  (*Id*.)  Accordingly, Vero Radiology had been a customer of both IBS and Devicor prior to Reed changing employers.  (*Id*. at 119, Page ID # 639.)  Reed interpreted Leu's

---

[10] The Declaration of Nick Nocito was filed electronically under this case number at Doc. 15.

email to indicate that Vero Radiology is merging the use of that unit with its stereotactic equipment for stereotactic-guided biopsies.  (*See* Nocito Decl. Ex. A; Tr. 118, Page ID # 638.) According to Reed, Vero Radiology continues to use Mammotome products in MRI-guided biopsies, the field in which Sentinelle also operates.  (Tr. 50, Page ID # 570.)  Moreover, Reed maintains he has had no conversations with anyone at Vero Radiology concerning or related to biopsy products since he left Devicor.  (*Id.* at 118, Page ID # 638.)

### 4.    Reed's Interaction with IBS, Hologic's Breast Biopsy Division

As indicated above, Reed does not dispute that one of Hologic's operating divisions, IBS, directly competes with Devicor's Mammotome division in the sale of breast biopsy equipment. (*See* Tr. 52, Page ID # 572.)  However, Reed maintains that his role at Sentinelle is completely separate from IBS and that he has no meaningful interaction with IBS sales representatives with respect to breast biopsy products or his former Devicor clients.

Devicor points out that the offer letter Reed received for his current position came from Hologic rather than Sentinelle.  (*Id.* at 58, Page ID # 578.)  Similarly, Reed's employment agreement characterizes Hologic rather than Sentinelle as his employer, Reed's paychecks come from Hologic, and Reed has an email address ending in "Hologic.com."  (*Id.* at 58–59, Page ID # 578–79; Pl. Ex. 12.)   Nonetheless, Reed identifies his employer at Sentinelle.  (Tr. 58, Page ID # 578.)  Reed reports to Sentinelle's office in Toronto, Canada rather than to Hologic's headquarters, which is in Bedford, Massachusetts.  (*Id.* at 84, Page ID # 604.)  All of Sentinelle's customer and product support resources are located in Toronto.  (*Id.*)

Since joining Sentinelle, Reed's direct supervisor has expressly instructed him to continue to abide by all restrictions in his Devicor Employee Covenants Agreement and to

18

refrain from discussing breast biopsy products.  (Def. Ex. 2 ¶ 6.)  In fact, Reed's supervisor

indicated that Reed "is not permitted to be involved in the marketing, sale, or servicing of any

biopsy products." (*Id*.)  Therefore, Reed has no responsibility for selling IBS' Breast Biopsy

Products in his position with Sentinelle, and has no financial incentive to sell or even promote

IBS' breast biopsy products.  (Def. Ex. 1 ¶ 14; Def. Ex. 2 ¶¶ 5, 9.)  Reed has not sold or

attempted to sell any breast biopsy products since leaving Devicor.  (*See* Def. Ex. 1 ¶ 22; Tr. 48,

Page ID # 568.)

   All of the sales and marketing initiatives for Sentinelle products have come from

Sentinelle's Toronto headquarters.  (Tr. 85, Page ID # 605.)  Reed does not report to anyone at

IBS' Indianapolis office, and he has had absolutely no contact with that office. (*Id*.)  Reed has

not received any marketing directives from IBS' Indianapolis office and does not anticipate

receiving any in the future. (*Id*. at 85–86, Page ID # 605–06.)  He has not participated in any

joint marketing initiatives with any IBS sales representatives, nor has he been asked to do so.

(*Id*. at 103, Page ID # 623.)

   Reed has had limited direct and indirect interaction with IBS representatives, but he

maintains that he has neither discussed any information related to his former role at Devicor nor

assisted those sales representatives with selling breast biopsy products.  The specific interactions

discussed during Reed's testimony include the following:

-  Reed's manager forwarded an email from Laurie Scussel, the IBS representative in

  central and north Florida, which email discussed a lead on a pre-existing IBS customer

  who also was a potential Sentinelle customer.  That client ultimately ended up purchasing

  an Invivo coil rather than a Sentinelle coil.  (*Id*. at 63, 89, Page ID # 583, 609.)

- Reed also has spoken with Kathleen Smith, the IBS representative for southern Florida, at least twice. On one occasion, she contacted Reed to see if he had any contact information for one of his former Mammotome clients that he could share with her. Reed informed her that he was unable to discuss biopsy equipment sales with her and that he could not provide her with the requested information. (*Id.* at 63–64, 88, Page ID # 583–84, 608.) On the other occasion, Smith pointed Reed to a potential new Sentinelle client. (*Id.* at 87–88, Page ID # 607–08.)

Devicor has not identified any instance in which Reed participated in or assisted with the sale of IBS' breast biopsy products to Devicor customers since his resignation. (*See id.* at 30–31, Page ID # 550–51.) Reed testified that he has not discussed any breast biopsy products with either current or potential Devicor customers. (*Id.* at 81–82, Page ID # 601–02.) He has made no attempt to induce any of his former Mammotome clients to cease doing business with Mammotome or reduce the volume of their business in any way. (*Id.* at 30–31, 92, Page ID # 550–51, 612.) Reed maintains that if any of his current clients were to ask him which breast biopsy equipment is superior, he would inform them that due to an agreement with his former employer, he can not answer any questions that are biopsy-related. (*Id.* at 82, Page ID # 602.) Additionally, when his former customers contact him with questions about their Mammotome equipment, he refers them to Nocito. (*Id.* at 92, Page ID # 612.)  He has not referred any former customer to an IBS sales representative. (*Id.* at 95, Page ID # 615.)

## II.   LEGAL STANDARD

Devicor's motion is governed by Fed. R. Civ. P. 65. The decision whether or not to grant a request for interim injunctive relief falls within the sound discretion of the district court.

20

*Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).  A preliminary injunction is an extraordinary remedy that should be granted only after consideration of the following four factors: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief.  *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *see also Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977).

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits – Breach of Contract Claim

With regard to the first factor, Devicor focuses on its breach of contract claim, arguing that it is likely to succeed in showing that Reed breached the non-competition provision of his Employee Covenants Agreement he executed while at Devicor.  The parties agree that the Employee Covenants Agreement is governed by Ohio law.  (Pl. Ex. 8 at 4 § 9.)  Devicor contends that the Agreement is reasonable and that Reed committed a clear breach of the non-competition provision by taking a job a Sentinelle.  Reed responds that: (a) he has not breached the non-competition provision in any manner that would warrant an injunction; and (b) that, in any case, that provision is unreasonable and unenforceable in that it is unnecessarily broad and does not protect any legitimate business interest of Devicor.

### 1.    Breach of Contract Claim – Non-Competition Provision

The non-competition provision and exception in Devicor's Employee Covenants Agreement may be summarized as follows:

**The Rule**: Reed may not work for a "Conflicting Organization." (Pl. Ex. 8 at 2 § 4.)

**The Exception**: Reed may work for a "Conflicting Organization whose business is diversified" if and only if:
(1) Reed is "render[ing] services to any division, department or other demonstrably separate segment of such Conflicting Organization that does not engage directly or indirectly in the same business as" Devicor;
(2) "provided, however, that prior to [Reed] accepting such employment" he will "submit to [Devicor] a separate written assurance, satisfactory to [Devicor] and signed by both [Reed] and the Conflicting Organization . . . reaffirming that" Reed will not render any services resulting in a breach of the Employee Covenants Agreement. (*Id.*)

The Court first will address the second clause of the Exception – the "notice clause" – as there appears to be less of a dispute over Reed's failure to entirely comply with that clause. Although Reed provided verbal notice to his former supervisor that he was leaving Devicor and accepting a position at Sentinelle, he concedes that he did not provide the written assurance called for in the notice clause. He argues, however, that his non-compliance with that clause amounts at most to a technical breach of the agreement and does not warrant the requested injunction. The Court agrees. Reed's failure to provide the required written assurance does not amount to a material breach of the Employee Covenants Agreement. To the extent that Agreement is legally enforceable, Reed would remain bound by it regardless of any additional assurances he may or may not have provided.

The more important question in this case is whether Reed has violated the spirit of the non-competition provision by taking a position with a competing division of a Conflicting Organization. There is no dispute that Hologic is a "Conflicting Organization," as defined in the non-competition clause. Nor is there any dispute that Hologic's IBS Division directly competes with Devicor. The crux of the parties' disagreement is the extent to which Hologic's Sentinelle

22

division engages in the same business as Devicor, whether directly or indirectly.

As an initial matter, the Court finds that the phrase "same business as Devicor" is somewhat ambiguous given the context of this case.  That phrase could be interpreted broadly to refer to any operating division occupying the same general field as Devicor, in which case it could encompass any operating division having anything to do with medical equipment used in a breast biopsy procedure, including imaging equipment.  The phrase alternatively could be interpreted more narrowly to refer to operating divisions who actually compete either directly or indirectly with Devicor.  Neither party addressed this ambiguity and both approach the question of whether a breach has occurred using the narrower interpretation.  Accordingly, the Court finds that the narrow interpretation was the parties intent when they entered into the agreement.

Devicor argues that Sentinelle competes with Hologic both directly and indirectly:

Direct Competition

In attempting to demonstrate direct competition, Devicor makes the following points:

- Devicor argues that Sentinelle is not a completely separate corporate entity, but rather is a "division" of Hologic, which is in direct competition with Devicor through it's IBS division.  Accordingly, Reed's true employer is Hologic, not Sentinelle, as is evidenced by the fact that Reed's offer letter was from "Hologic" rather than "Sentinelle," his paycheck states "Hologic," he is part of Hologic's employee benefits plan, he has a Hologic email address, and signed an employee covenant agreement with Hologic (*see* Pl. Ex. 12).

- Hologic's public Securities and Exchange Commission ("SEC") filings, available on Hologic's website, refer to the IBS and Sentinelle divisions together as part of the

"Breast Health" segment of Hologic's business.  (Doc. 27 at 8–9, Page ID # 694–95.)

Devicor's first argument is circular and would render the Non-Compete Exception meaningless.  Devicor's argument breaks down as follows: Sentinelle is a division of Hologic, a Conflicting Organization ⇒ As a Conflicting Organization, Hologic directly competes with Devicor ⇒ Therefore, Sentinelle directly competes with Devicor.  If the Court were to accept that line of reasoning, there would never be a situation in which a division of a Conflicting Organization, which by its very definition is competing, would satisfy the terms of the Non-Compete Exception.

Furthermore, Devicor's attempt to draw a distinction between separate corporate entities with separate legal identities and mere operating divisions or business units is irrelevant as the Employee Covenants Agreement itself does not draw that distinction.  Rather, the Non-Compete Exception refers specifically to "any *division*, *department* or other  demonstrably separate *segment* of [a] Conflicting Organization."  Had Devicor intended that exception to apply only to a completely separate corporate subsidiary, rather than a separate division or department, it could have drafted the agreement accordingly.

Finally, there was little to no evidence presented regarding the actual corporate structure of Hologic, other than that which Defendant presented.  That evidence indicates that, aside from dealing with human resource matters such as employee benefits and pay, Sentinelle operates as a separate business unit, with its own headquarters and management structure.

With regard to Devicor's second argument, there was no testimony about Hologic's SEC filings and the document to which Devicor refers was not submitted as an exhibit.  Accordingly, Reed has had no opportunity to respond to it, and the Court accords it little to no weight.

24

Indirect Competition

Devicor argues that Sentinelle competes indirectly with Devicor by virtue of its relationship with IBS, Hologic's breast biopsy division.  The evidence highlighted by Devicor includes the following:

- Both Reed and Norris testified as to the interplay between the breast biopsy and breast imaging businesses and the importance of the relationships between the salespeople in both industries;

- Reed conceded that "in general[,] . . . the purchase of specific imaging equipment can possibly impact the decision to purchase biopsy equipment" (Tr. 58, Page ID # 578);

- Since Reed has been at Hologic, at least one representative of IBS has reached out to him to see if he had any contacts with a potential customer of IBS' breast biopsy equipment, and other IBS employees have notified Reed of potential Sentinelle contacts;

- Hologic's CEO has made a statement indicating Hologic's intent to sell Sentinelle products through existing sales channels;

- One of IBS' "total solution" sales brochures references the teaming of Hologic and Sentinelle, and the brochure includes images of Sentinelle products;

- Devicor's Senior Marketing Manager, Norris, indicated that he knew of at least one incident in which a former Mammotome client in Indiana decided to switch to IBS products after purchasing an imaging table from Sentinelle, because IBS offered the client a lower servicing fee (Tr. 25, Page ID. # 545);

- Sentinelle used to display its products with the biopsy equipment of Devicor, Bard, and IBS at the annual RSNA trade show, but now that Sentinelle is a Hologic company, it

25

displays its products with IBS products only; and finally

• Since Hologic's acquisition of Sentinelle, Sentinelle has not engaged in any joint seminars or meetings with Devicor.[11]

Devicor certainly cites more evidence to support its indirect competition theory than it did in support of its direct competition theory. Nonetheless, Reed points to at least as much evidence suggesting that Sentinelle does not actually compete with Devicor. First, the overlap between Sentinelle's business and the breast biopsy industry is not as large as Defendant claims. As described in great detail above, Sentinelle and Mammotome sell completely different products. Sentinelle sells products used in both breast and prostate imaging. Devicor's products are not used in prostate-related procedures. Sentinelle's breast imaging products are compatible with Devicor's breast biopsy products, and therefore may occasionally be used together during an MRI-guided breast biopsy. Reed's concession that "the purchase of specific imaging equipment can possibly impact the decision to purchase biopsy equipment" does not automatically render Sentinelle a competing company. There are many factors that may go into a customer's choice of biopsy equipment providers, and Reed indicated that he has several clients who continue to use both Sentinelle and Devicor products.

Second, due to the compatibility of the products, it is not surprising that representatives of the companies selling breast biopsy equipment would want to develop relationships with the representatives of the companies selling breast imaging devices. Contrary to Devicor's assertion that Sentinelle's representatives have stopped interacting with Devicor's representatives, both

---

[11] Defendant also references Nocito's claim, made during his deposition, that he had heard from his customers that Hologic was offering them a deal on bundled IBS and Sentinelle equipment. (Nocito Dep. 44, Page ID # 480.) That testimony is hearsay and the Court will not consider it as evidence of any bundled sales deals.

Reed and his current supervisor at Sentinelle testified that Sentinelle representatives still are encouraged to develop relationships with representatives from Mammotome and Bard and to interact with those representatives in a similar fashion as they interact with representatives of IBS.

Finally, the evidence that Devicor claims demonstrates Hologic's plan to jointly market Sentinelle and IBS products and to offer the products in a bundled deal at a reduced price is weak.  Devicor does not dispute that regardless of Hologic's CEO's statement about offering Sentinelle products through existing sales channels,[12] Sentinelle maintains its own, independent sales force.  Reed testified that he had never seen the one example of joint marketing that Devicor identified, the IBS sales brochure, that he was not aware of any joint marketing efforts, and that he has not received any marketing directives from anyone at IBS.  Reed's supervisor stated in his declaration that he is aware of discussions regarding the joint marketing of products sold by Hologic's separate divisions, but he did not discuss the extent or result of those discussions.

In summation, both sides present evidence in support of their view of Sentinelle.  Neither party's evidence strongly tips the scale to one side or the other.  Instead, the extent to which Sentinelle may be considered to be indirectly competing with Devicor remains questionable. The Court therefore finds that Devicor has not satisfied its burden to prove a likelihood of success with regard to the question of whether Reed's employment at Sentinelle amounts to a material breach of his Employee Covenants Agreement.

### 2.        Reasonableness of Agreement

---

[12] As noted above, the press release reporting this statement is inadmissible hearsay.

Reed alternatively argues that the Employee Covenants Agreement is unenforceable because it is overly-broad and does not protect any legitimate business interest.  To the extent that employee covenants restraining competition are reasonable, such agreements are typically upheld under Ohio law.  *See Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 747 N.E.2d 268, 275 (Ohio Ct. App. 2000).  Where a court finds certain portions of a noncompete agreement unreasonable, the court should nonetheless enforce the agreement "to the extent necessary to protect an employer's legitimate interest." *Id*. (quoting *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 544 (1975) (paragraph one of the syllabus)).

"A non-compete agreement is considered reasonable, under Ohio law, if three conditions are met: (1) it goes no further than necessary to protect the legitimate interests of the employer; (2) it does not impose undue hardships on the employee; and (3) it is not injurious to the public." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 (6th Cir. 2004) (citing *Raimonde*, 42 Ohio St.2d 21, 325 N.E.2d at 547).  "The party seeking to enforce the covenant 'is required to adduce clear and convincing evidence as to each of these factors' in order to prove that the covenant is reasonable." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991–92 (6th Cir. 2007) (quoting *Levine v. Beckman*, 48 Ohio App.3d 24, 548 N.E.2d 267, 270 (Ohio Ct. App. 1988)).

Reed's over-breadth and lack of legitimate business interest arguments are entwined. Reed points out that since filing this action, Devicor has indicated that it would be willing to accept an injunction narrower in scope than that which it originally requested.  Indeed, over the course of this lawsuit, Devicor have proposed at least three versions of the requested injunction, at different times asking the Court to enjoin Reed for a period of one year from: (1) engaging in

28

any sales or other activity on behalf of Hologic (Doc. 27 at 19, Page ID # 705); (2) engaging in any sales or other activity on behalf of Hologic within his former Devicor territory, which would restrict Reed not only from working with his former Devicor customers but also with any potential Sentinelle customers who happen to be in his former sales territory (*Id*. at 20, Page ID # 706); or (3) engaging in any sales or other activity on behalf of Hologic with the fifteen or twenty customers or potential customers with whom he had worked while at Devicor (Tr. 122–24, Page ID # 642–44).  Reed argues that these variations cut against Devicor's contention that the non-competition provision in question goes no further than necessary to protect legitimate business interests.

Devicor's apparent difficulty in identifying the precise nature of the injunctive relief it requests indicates to this Court that Devicor also is not clear about the precise interest or interests the non-competition provision was meant to protect.  During the preliminary injunction hearing, Devicor's attorney described Devicor's business interest as follows:

> The law protects those – extends the finite terms, the written terms of the noncompete to the extent that an employer has a protectable interest, okay.  We believe Mr. Reed should be precluded from working for Sentinelle at all.  However, we recognize that the particular value that he has in selling Sentinelle is the relationships he formed within that [his sales region] and on behalf of Devicor.  So understanding that as it's written it would certainly preclude him from working for Sentinelle at all in our view, the protectable interest really lay in the value of those relationships that he formed when he was at Devicor and now will be used against us.

(*Id*. at 123–24, Page ID # 644-45.)  If the business interest that Devicor seeks to protect lie in the relationships Reed formed with customers while at Devicor, then there can be no argument that the non-compete provision is overbroad and unenforceable to the extent that it would restrict Reed from working with any Sentinelle customers other than those with whom he has prior

29

relationships. The first two versions of the injunction Devicor requests would do just that.

Reed further argues that the alleged interest Devicor identified, the relationships Reed developed with customers during his time at Devicor, also is suspect. There is little doubt that the protection of "existing customer relations is a legitimate employer interest." *Miller Medical Sales, Inc. v. Worstell*, No. 91AP-610, 1992 WL 31988, at *4 (Ohio Ct. App. Feb. 18, 1992). For example, when Company A relies on a salesperson to develop and maintain a book of business, Company A would have a legitimate interest in preventing that salesperson from taking that book of business to competing Company B and exploiting his relationships to draw customers away from Company A. *See Columbus Medical Equip. Co. v. Watters*, 13 Ohio App.3d 149, 468 N.E.2d 343, 346–47 (Ohio Ct. App. 1983) (affirming a trial court's grant of injunctive relief to a medical supply company where a former salesperson took customer lists and used the lists at a competing medical supply company in violation of the salesperson's non-compete agreement)

In this case, while Reed had developed relationships with his customers at Devicor, the evidence demonstrated that all of those customers are well known across the imaging and biopsy industries and that Sentinelle already had relationships with several of them prior to Reed joining Sentinelle. In light of those facts, the Court agrees that the legitimacy of Devicor's alleged business interest is at least questionable and that Devicor has not at this time shown clear and convincing evidence of the enforceability of the non-compete provision.

Due to both the questionable enforceability of the non-competition provision and the lack of sufficient evidence demonstrating that Reed likely committed a material breach of that provision, the Court concludes Devicor has not demonstrated a likelihood of success on the

merits of its breach of contract claim.

**B.      Irreparable Injury**

Turning to the second factor of the preliminary injunction test, the Court also finds little evidence that Devicor will suffer irreparable harm absent the requested injunction.  A party requesting injunctive relief must make some showing of irreparable harm in order to justify a preliminary injunction.  *See Friendship Materials, Inc.*, 679 F.2d at 102–03 ("[T]his court has never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief.").  To demonstrate irreparable harm, Devicor must show that it will suffer "'actual and imminent' harm rather than harm that is speculative or unsubstantiated."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  Devicor alleges that it will suffer the following harm:

First, Devicor claims that Hologic's ability to jointly market Sentinelle and IBS combined with Reed's ability to exploit his knowledge of and relationships with Devicor's customers will result in Devicor losing business and customer goodwill to IBS.  There is no evidence that Reed has made any attempt to solicit his former clients to switch from Mammotome products to Hologic's IBS breast biopsy products.  Rather, the evidence demonstrates that he is marketing Sentinelle's breast and prostate imaging equipment.  He has maintained throughout this action that he has not and will not engage in any effort to divert business from Mammotome to IBS, and Devicor has shown no evidence that would cast doubt on his assurances.

The only instances Devicor can point to in which Mammotome lost business to IBS have little if anything to do with Reed.  The incident Norris described in which one of Mammotome's

31

customers in Indiana decided to switch to IBS because IBS charged lower servicing fees had nothing to do with Reed.  Reed has never worked with customers in Indiana.  The only other specific loss of business that Devicor identified was with regard to Vero Radiology.  That incident is described in detail above.  Other than the reference to Reed in Leu's email, there is little to no evidence that Vero Radiology's decision to switch to IBS products for stereotactic-guided biopsies has anything to do with Reed working for Sentinelle, a company that sells MRI-related devices.  Furthermore, Leu's email is ambiguous.  Her statement that "*[s]ince* Keith has moved on from [Devicor] the radiologists have decided to merge our atec unit from Hologics[sic] into our stereo room," could be interpreted to mean simply that in the six weeks that elapsed between when Reed left Devicor and Nocito finally contacted them, they had decided to switch products.  (Nocito Decl. Ex. A (emphasis added).)  The Court finds that interpretation of her email more convincing given that her next statement is an actual explanation of *why* Vero Radiology decided to switch products: "We had already been utilizing the equipment in our US department so they decided they preferred to use it in stereo also giving them consistence between departments as well as they are using this at Sebastian Hospital also." (*Id.*)

If anything, the evidence Devicor cites demonstrates that Hologic's purchase of Sentinelle may have given Hologic's IBS division a competitive edge over Mammotome. Reed's employment with Sentinelle has nothing to do with that acquisition, and that competitive edge would exist even if Reed had not left Devicor for Sentinelle.  In other words, most of the damage described by Devicor appears to relate to Hologic's acquisition of Sentinelle, not to Reed's alleged breach of his non-compete.  Reed is the Defendant in this case, not Hologic.

32

Devicor has not shown that it will suffer irreparable harm as a result of Reed's actions.

As indicated above, Reed maintains, and Devicor cites no evidence to the contrary, that he has not participated in, assisted with, or encouraged the sale of IBS' breast biopsy products to Devicor customers since his resignation; he has not discussed any breast biopsy products with either current or potential Devicor customers; and he has neither referred any former customer to an IBS sales representative nor given any IBS representative any contact or other information about his former customers.

Devicor compares this case to *Miller Medical Sales, Inc.*, No. 91AP-610, 1992 WL 31988, in which an Ohio appellate court reversed the decision of a trial court denying injunctive relief to a company seeking to enforce a non-compete against its former salesman. The company in question was in the medical supply business and the employee had specialized in marketing transcutaneous electrical nerve stimulators, or TENS units, for the company. *Id*. at *2. The major difference between the instant case and *Miller* is that in *Miller*, the defendant employee took a position with a direct competitor marketing the exact same equipment (TENS units) he had marketed for his former employer and the court was shown evidence that he had contacted his former clients to solicit business on behalf of his new employer. *See id*. at *3. Here, there is no such evidence, and the potential harm Devicor describes is entirely speculative.

Devicor lastly argues that Reed inevitably will use and disseminate Devicor's confidential information.[13] Ohio Law recognizes an inevitable disclosure doctrine stating "that where an employee with detailed, comprehensive knowledge of an employer's trade secrets and confidential information begins employment with a competitor in a substantially similar position,

_____

[13] There is no evidence that Reed actually has used or revealed any confidential information.

33

her disclosure of trade secret information is inevitable." *MP TotalCare Services, Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 968–69 (N.D. Ohio 2009) (citing *Berardi's Fresh Roast Inc. v. PMD Enters., Inc.*, No. 90822, 2008 WL 4681825, at *4 (Ohio Ct. App. 2008)). That doctrine is inapplicable here for at least two reasons. First, other than Reed's general agreement that with the exception of client lists, the types of information listed in the non-disclosure provision of his Employee Covenants Agreement are confidential, there is scant evidence that Reed ever had access to any information that was truly confidential, let alone detailed, comprehensive knowledge of such information. Second, Reed is not currently working in a substantially similar position as he was in at Devicor. His job now involves the sale of an entirely different category of medical equipment – imaging equipment rather than biopsy equipment – and Devicor offers little to no explanation as to how it fears Reed might use any of Devicor's confidential information in his role at Sentinelle.

### C.      Substantial Harm to Others and Public Interest

The Court finally finds that the final two factors to be considered – the risk of the requested relief resulting in substantial harm to others and the degree to which the public interest would be served by granting Plaintiff's motion – neither weighs in favor of nor against the requested injunction.

Because the first two factors weigh in favor of denying injunctive relief, the Court denies Plaintiff's Motion for Preliminary Injunction.

## V.      CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion for a Preliminary Injunction. (Doc. 3.) The Court also **DENIES AS MOOT** Plaintiff's Leave to File

34

Supplemental Memorandum in Support of Motion for Preliminary Injunction (Doc. 28), as the proposed supplemental memorandum contains no information that would alter the analysis or conclusion set forth herein.

        IT IS SO ORDERED.


                                       ___s/Susan J. Dlott_____
                                       Chief Judge Susan J. Dlott
                                       United States District Court